AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, American Motorists Insurance Company, Federal Mutual Insurance Company and Lumbermens Mutual Casualty Company, Plaintiffs,

v.

AMERICAN BROADCASTING–PARAMOUNT THEATRES, INC., Defendant.

No. 63 Civ. 1492.

United States District Court
S. D. New York.

May 31, 1967.

Lord, Day & Lord, New York City, John W. Castles III, Muriel Bell, William E. McCurdy, Jr., New York City, of counsel, for plaintiffs.

Hawkins, Delafield & Wood, New York City, Clarence Fried, Robert G. Desmond, New York City, of counsel, for defendant.

## OPINION

TENNEY, District Judge.

Plaintiffs, widely known as the Kemper Insurance Companies (hereinafter collectively referred to as "Kemper"), instituted this action against the defendant, American Broadcasting-Paramount Theatres, Inc. (hereinafter referred to as "ABC"): to obtain an adjudication that a contract between Kemper and ABC, dated August 15, 1962, for the sponsorship of the program "Evening

Report" over the ABC network is illegal and unenforceable under Section 1 of the Sherman Anti-Trust Act, 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1964); to obtain a permanent injunction staying ABC from prosecuting an action in the New York State Court to recover damages for Kemper's cancellation of the contract (28 U.S.C. § 2283 (1964)); and for an award of treble damages (38 Stat. 731 (1914), 15 U.S.C. § 15 (1964)), and such other relief as may be appropriate.

On June 20, 1963, ABC moved, under Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss Kemper's complaint, and, in the alternative, under Rule 12(f), to strike therefrom the allegations pertaining: to ABC's control over the broadcast time of its affiliates; to ABC's State Court suit; and to Kemper's request for a permanent injunction against said suit.

On August 14, 1963, this Court (per Cooper, J.) denied ABC's motions to dismiss and to strike. American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 221 F.Supp. 848 (S.D.N.Y.1963).[1] Thereafter, on August 26, 1963, ABC answered the complaint. Subsequent to that time, extensive discovery has been pursued by both parties in the form of interrogatories, depositions and documentary evidence submitted herewith.

On September 4, 1964, the case at bar was assigned to me for all purposes by then Chief Judge Ryan pursuant to Rule 2 of the General Rules of this district. No jury demand has been made.

The matter is presently before this Court on a motion by Kemper for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds that the pleadings and papers filed in support of such motion demonstrate that there is no genuine issue as to any material fact, and that plaintiff is entitled to judgment as a matter of law. Defendant ABC, while alleging in opposition to Kemper's motion that there are triable issues of fact, has itself cross-moved for summary judgment.[2] Certain facts would appear not to be disputed, and will be set forth hereinafter.

In 1962, the year during which the contract at issue was negotiated and consummated, there were approximately 556 TV stations in this country and practically the entire gross income of the TV industry, which totaled one and one-half billion dollars in that year, was derived from the sale to advertisers of the broadcast time of these stations.

There are three major networks in the United States, of which ABC is one, having operated its network for almost fifteen years, and in 1962–63 ABC had approximately 260 stations affiliated with it. In addition to its affiliates, ABC is itself owner and licensee of five

---

1. Judge Cooper, of course, had before him only the complaint, and stated:

 "For purposes of such a motion, all the material allegations in the complaint are deemed true. Further, in determining the merits of the motion, it must be borne in mind that, ' * * * a complaint should not be dismissed for insufficiency *unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.*' " Id. at 849. (Emphasis by Judge Cooper.)

2. The Court recognizes "that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot", Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), (footnote omitted) and that the Court must look at the record on summary judgment in the light most favorable to the party opposing the motion. However, where a single issue may be dispositive of the claim of anti-trust illegality, and particularly where, as in the instant case, voluminous exhibits, depositions and affidavits have been submitted, summary judgment may be proper. Crest Auto Supplies, Inc. v. Ero Mfg. Co., 360 F.2d 896 (7th Cir. 1966).

TV stations.[3] In 1962, ABC's gross income from the sale of TV and radio time and programs, less discounts, rebates and commissions to advertising agencies, totaled $174,523,295.00. In that same year, the three networks (NBC, CBS and ABC), plus their fifteen owned and operated stations, reported total revenues of $754.2 million, accounting for 50.7 per cent of the industry total, and profits of $111.4 million, representing 35.8 per cent of the industry total. In 1962, 73 per cent of the total broadcasting revenues of TV stations in this country were derived from the sale of broadcast time, and the balance from the sale of talent and program materials. Of the sales of broadcast time, 40 per cent were network sales, 41 per cent were national spot sales, and 19 per cent were sales to local advertisers.

Programs are produced by the TV stations, by independent producers, or by a network. Where the program is not a network program, the station is free to sell the broadcast time on that program directly to advertisers, such direct sales being made in either the national, regional, or local markets.[4] In the national and regional markets, each station is represented by an agency in the principal TV centers of the country, specifically, New York and Chicago. These agencies are known as national spot representatives, and sales of broadcast time made directly by a TV station to national or regional advertisers are known as "national spot sales". Whenever an advertiser buys on the national spot market, he buys time on such stations as he desires to deal with, for the advertiser is dealing directly with the individual station through its national spot representative.[5] Sales to local advertisers made directly by a TV station are known

3. "The primary function of the networks, however, is as a sales agent, arranging for the interconnection of television stations, to provide simultaneous broadcast of programs and commercials, selling time on the interconnected facilities to national advertisers and arranging the sale of programming to advertisers to fill the noncommercial segments of the time sold. Almost all network income comes from these sales of time and programs. Major network expenses are the cost of arranging the interconnection of affiliates, the cost of maintaining a news and public affairs department, and the cost of administration. Payments to affiliated stations are on a percentage basis. If the station is not sold to the advertiser as part of the desired network it receives no compensation." Blake & Blum, Network Television Rate Practices: A Case Study in the Failure of Social Control of Price Discrimination, 74 Yale L.J. 1339, 1344 (1965). (Footnote omitted.)

4. "A network is not a common carrier and each therefore had the right in the absence of concerted action to make such contracts for the distribution of its programs as it chose. Plaintiff [non-affiliate] had no inherent right to set its own rate to an advertiser and in all other respects to use the facilities of the radio network, nor does the court have power to compel defendants [the networks] to deal with the plaintiff on such terms. Plaintiff misconceives the function of a network, which buys time from the stations and sells to the advertisers its facilities and the services of those stations as an aggregate. Not only are the networks not common carriers, but it would be cumbersome if not impractical for them to furnish programs if they did not have authority to deal independently with the advertising concerns instead of leaving the rates to be determined individually by the different stations which they serve. Such control by a network, operating as a single coordinating agency, would seem to be at least desirable in order that it might compete with other networks and advertising media and to assure a more reasonable distribution to every station of the income which the network as a whole may receive." Federal Broadcasting System, Inc. v. American Broadcasting Co., 167 F.2d 349, 351–352 (2d Cir.), cert. denied, 335 U.S. 821, 69 S.Ct. 43, 93 L.Ed. 375 (1948).

5. The term "spot sale" has acquired several meanings in the television industry. One meaning refers to all non-network sales of station time while it has also been interpreted to mean those commercials not accompanied by programming. It is generally concluded that this latter type of advertising is less valuable than sponsorship of a particular program since television audiences usually decrease in that period between programs and because the sponsor is not identified with a particular program. Blake & Blum, supra note 3, at 1343 n. 13.

as sales on the "local market" and in 1962 totaled $242.5 million.

As stated above, networks also produce programs which are made available to the TV stations. In April of 1961, ABC announced its intention to produce a new nightly news program entitled "Evening Report", which it offered for clearance (acceptance) on a five-nights-a-week basis only. Prior to the fall of 1961, "Evening Report" was broadcast without any network sponsor.

By August of 1961 there was a "going lineup" of 95 stations which had cleared the program for broadcast beginning in September 1961, of which stations approximately 90 per cent were primary affiliates having their major network alliance with ABC, the balance or secondary affiliates being for the most part stations which had a primary affiliation with another network.[6] The primary affiliates of ABC cleared the "Evening Report" program series in accordance with the terms of ABC's standard form of affiliation agreement, under which such primary stations were given first call on ABC network programming in their areas, and, accordingly, were first offered the ABC programs or program series for clearance. Under the affiliation agreements, certain time was "optioned" to ABC by the affiliates. "Evening Report", however *was not broadcast during the option time hours* set forth in the agreements and *thus each affiliate had the right to accept or reject the program*. Upon the affiliates' clearing the program, the entire commercial time connected with that program became subject to ABC's use and control. When the program or program series with a network sponsor was first offered to an affiliate for clearance, the station could not accept the program and reject the sponsor provided by ABC. Also, if at the time of the initial clearance of a program series, ABC had secured sponsorship for only a part of the commercial time, the primary affiliate would nevertheless have had to accept the entire program series, including the unsponsored portion for which the station received no payment. The station was to carry the entire program series in accordance with the affiliation agreement, including portions unsold to a network sponsor, subject to release by ABC to the affiliate of all or part of the unsold time. The affiliates could not make any commercial use of this time by direct sale to advertisers unless the network permitted it by releasing the time to them. In 1962, ABC did release such unsold portions of program series to the affiliates for direct sale by them, but only with the proviso that such time was subject to recapture by the network upon three weeks' notice. This release of the commercial time which the network had been unable to sell allowed the station to sell that time directly to local advertisers or on the national "spot market" without compensation to the network.

Thus, the clearance of a program or program series by an affiliate meant that it had to carry the entire program or series, including portions where there was no network sponsor. And although the affiliate was not compensated by the network for the commercial time for which there was no network sponsor, the affiliate could not sell that time directly to advertisers unless it were released by the network. Finally, even when released, any sales would have to be subject to the network's right to recapture the time and oust the advertiser

---

**6.** "Network affiliation is highly prized by stations, and all but a very few are affiliated with at least one of the three networks. Stations lacking network affiliation are less profitable than affiliates and their failure rate is higher. The networks select affiliates on the basis of their ability to provide the widest possible coverage without substantial duplication. * * *

A network affiliate which is offered network programming and advertising may refuse to carry or 'clear' the program, may offer to clear it at a different time, or may accept it. Despite the number of alternatives legally open to affiliates, the networks obtain a high rate of station acceptance for their programs." Blake & Blum, supra note 3, at 1343. (Footnotes omitted.)

to whom the station had made its direct sale.

The affiliates which had cleared the "Evening Report" series were compensated by those segments of the series actually sponsored by a network advertiser. The method of compensating ABC's primary affiliates for the use of this time was based on a formula whereby ABC first fixed a network hourly station rate for each affiliate, which was the rate set forth in ABC's published rate card. Each month an average unit hourly rate was computed by dividing the total dollar value of all network programs carried during that period at such rate, by the number of unit hours carried. This average hourly rate was then multiplied by the number of unit hours in excess of 22, so as to afford ABC 22 unit free hours of time, and the affiliates were paid as compensation 30 per cent of this total figure. The effect of this arrangement was that the rate of compensation to an affiliate increased as the number of hours of network programming per month in excess of 22 unit hours increased. With respect to its secondary affiliates, no 22 hours of "free time" was supplied to ABC, and, instead, those stations received a straight 30 per cent of the total amount billed to the advertiser at network station rates.

In April of 1961, after the "Evening Report" program series became available, ABC prepared, in accordance with its regular practice, offering sheets regarding the program. The offering sheet of April 27, 1961 offered the program series in one-quarter hour segments for each of 5 days in each week and for periods of 13 or 26 weeks. The approximate gross was set at $34,500.00, based on rate card time charges, as to which "Special Discounts" were allowed, depending on the number of segments purchased. This was only an approximation, presumably based on a network of 110 stations, the figure used in the offering sheet to project estimated audience and efficiency. The discounted figure represented the time charge, to which was added a program charge of $5,750.00

($5,000 plus 15 per cent commission) and a networking charge of $500.00. In other words, the approximate cost to the sponsor was obtained by subtracting the discount from the approximate gross and adding to that figure the program charge and the networking charge. Thus, it offered "Evening Report" at a 35 per cent discount from gross rate card time charges for the purchase of two (2) one-quarter hour segments over 26 weeks, plus program and network charges, or $28,675.00 per segment, and at a 30 per cent discount plus program and network charges for the purchase of one (1) one-quarter hour segment over the same period, or $30,400.00 per segment.

The offering sheet of August 21, 1961 offered similar discounts and program and network charges. However, gross rate card time charges were based on the rate card charges of 95 cleared stations (identified in the offering sheet) which amounted to $27,926.00 plus a contingency allowance for additional stations and rate increases of $4,074.00 or a total gross rate charge of $32,000.00. Thus, it offered the program series for $27,050.00 per segment for two (2) one-quarter hour segments and for $28,650.00 per segment for one (1) one-quarter hour segment over the 26-week period.

However, it would appear that it was ABC's practice to negotiate with advertisers a final price at a further discount from the offering sheet prices, and that television network prices are negotiated prices. There was also testimony that it was ABC's practice to offer time to individual customers at less than the figure in the offering sheet and then negotiate from that figure to a lower final selling price.

The offering sheet of October 3, 1961 offered similar discounts and network charges but the program price was increased to $6,210.00. The gross rate card time charges were based on the rate card charges of 100 stations of $29,141.00 plus a contingency allowance for additional stations and rate increases of

$859.00 or a total gross rate charge of $30,000.00. It offered the program series for $26,210.00 per segment for two (2) one-quarter hour segments and for $27,710.00 per segment for one (1) one-quarter hour segment over the 26-week period. The special discounts offered were the same as in the prior offerings.

The final offering sheet relevant to the present controversy was issued by ABC on June 13, 1962, approximately two months before the contract between ABC and Kemper was executed. This document lists a lineup of 100 cleared stations and a total price per segment of $36,250, consisting of an approximate gross time charge of $30,000 plus the program price of $5,750 and network charge of $500. However, no provision was made for any special discounts; the offering sheet merely stated that the gross time charges were "subject to discounts as provided by ABC's then current rate card." The offering sheet listed sponsorship by "American Tobacco, Kemper, Plywood, Schick and Squibb."

The contract executed on August 15, 1962 was the product of a lengthy series of negotiations between Kemper's advertising agency, Clinton E. Frank, Inc. (hereinafter referred to as the "Frank Agency") and ABC. Much with respect to these negotiations is not disputed or is documentary in nature. It is Kemper's claim that in the course of negotiations, ABC conditioned the sale of sponsorship of "Evening Report" to Kemper upon Kemper's purchase of time to broadcast "Evening Report" over 35 of ABC's affiliated stations serving market areas in which Kemper did not wish to advertise, advancing the legal theory that ABC's actions constituted an unreasonable restraint of trade within the meaning of Section 1 of the Sherman Anti-Trust Act. In the light of such claim, it is helpful to examine these negotiations from their inception until their culmination in the execution on August 15, 1962 of the agreement between ABC and Kemper whereby the latter agreed to sponsor "Evening Report" one night per week over a 26-week period, beginning October 17, 1962.

It is not disputed that on January 25, 1962, Buckingham W. Gunn, Senior Vice President and Director of Broadcasting Services of the Frank Agency, had a meeting at ABC's offices in New York with Edgar Scherick, who at that time was ABC's Vice President in charge of network sales. Mr. Scherick offered sponsorship of "Evening Report" to Kemper at a package price of $22,000 per one-quarter hour segment for two segments per week over a 26-week period. Apparently no commitment was made at this meeting other than Gunn's statement that he would report the offer to Kemper. On February 8, 1962, John Beebe, a TV account executive in ABC's Chicago office, wrote Gunn "that probably ABC would be willing to go along with a special package price of roughly $20,000 a program or $100,000 a week * * * on the assumption that Kemper Insurance could use 2½ minutes a day 5 days a week." Mr. Beebe again wrote Mr. Gunn on March 23, 1962, referring to the $22,000 per segment price quoted by Mr. Scherick and stating: "As I pointed out to you yesterday, rate card per quarter-hour comes in at $36,250. At the special package price offered to you this would be $66,000 a week for 13 weeks, for a total cost of $858,000 for the 13 weeks beginning in October."[7] On the same day, William C. Gillogly, the head of ABC's Chicago office, sent a memorandum to Mr. Scherick in New York, confirming an earlier telephone conversation on that date and reminding him that he had quoted to Gunn the $22,000 price per quarter-hour segment for two segments a week over a 26-week period. "This is roughly 50% plus discount on time. Buck [Buckingham W.

---

7. Beebe (in Chicago) apparently was not too clear about what Scherick (in New York) had offered Gunn. Scherick's offer was a package price of $22,000 per segment for 2 segments per week for 26 weeks, not $20,000 for 5 segments per week, or $22,000 for 3 segments per week for 13 weeks

Gunn] is actually going with this figure, but you are going to recheck whether its okay." Mr. Scherick's reply, by wire dated March 26, 1962, stated: "Quote to Gunn Kemper Insurance for Early News okay." Thereafter, on March 28, 1962, Mr. Beebe wrote Mr. Gunn enclosing "all of the available material we have here on our EARLY NEWS." One of the enclosures may have been a list of stations carrying "Evening Report" as of February 1962, in which 99 stations were listed. In any event, it is not disputed that Mr. Gunn had received such a list by the early part of April 1962. There is testimony to the effect that when Mr. Gunn received the list of stations he instructed his secretary, Miss Flannery, to "check Mr. De Mark and give him the list of these stations" (Gunn Deposition of Nov. 1, 1963 at 40) and that a copy was sent to Mr. De Mark on April 16, 1962. Mr. De Mark had been Advertising Manager of Kemper since 1960. There is further testimony that upon seeing the list of stations, Mr. De Mark indicated to Mr. Gunn over the telephone that there were at least 20 stations which would not be suitable,[8] that Mr. Gunn's secretary, Miss Flannery, got on the telephone with Mr. De Mark and marked down on a copy of the February line-up those stations which Kemper did not want. In any event, on or before the following day, April 17, 1962, Mr. Gunn prepared a brochure dated that date, entitled "1962 Television Recommendation for Kemper Insurance Group, ABC-TV Evening Report," referred to herein as the "Silver Report". It is stated on page 2 of this report:

At this precise moment the ABC EVENING REPORT can be bought in a number of ways. Squibb, who has sponsored 3 segments a week this year, will probably return in the fall. (American Tobacco, Block Drug, and Schick are other interested advertisers.) According to ABC-TV's rate card, a one-segment-a-week sponsor pays a higher rate-per-segment than a two-a-week sponsor, who in turn pays a higher rate than a three-a-week sponsor, and so on. The rate card per quarter-hour segment calls for $36,250 per segment, time and program, commissionable. However, when the agency went to New York to discuss programming for Kemper with the network's chief executives, we were able to get a special reduced per-segment price of $22,000, time and program, commissionable. This represents a discount of approximately 40 percent.

Four sponsorship plans were outlined on the same page: (a) two $\frac{1}{4}$ hour segments per week over a 26-week period at $22,000 per segment; (b) two segments one week, one segment the next week, over a 26-week period at $22,000 per segment; (c) one segment a week over a 26-week period for an estimated $25,000 per segment; and (d) one segment a week over a 13-week period for an estimated $27,500 per segment (to combine with All-Star Golf, also sponsored by Kemper). The Frank Agency recommended (b), namely, the purchase of sponsorship "for 26 weeks on the rotation of two segments one week, one segment the next" at $22,000 per segment. Attached to the Silver Report was a new list for the coming fall, identifying 99 stations that had already cleared, and an additional 28 stations desired by Kemper which had not cleared. Of these 28 stations, 15 were listed as "pending" and 13 as "non-clear". As stated at page 3 of the Report, "It is to be hoped that sponsorship by Kemper and a continuing effort by ABC and the agency will move the 'pending' stations to the 'cleared' list by fall and perhaps, altho [sic] it is doubtful, some of the 'non-clear' stations as well." Although no mention of unwanted stations is contained in the Report itself, on the list of stations attached thereto 20 stations are marked with asterisks as being "markets Kemper does not want", presumably based on the telephone conver-

---

8. The list of unwanted stations had increased to 32 stations by May 4, and possibly as early as April 27th.

sation between Mr. De Mark, Mr. Gunn and Miss Flannery on the prior day. There is testimony to the effect that on April 17, 1962, a meeting occurred at the Kemper offices between Messrs. Gillogly and Beebe of ABC and Messrs. De Mark and Gunn of Kemper, and Mr. Norris C. Flanagin, one of the senior executives of Kemper. Prior to going over to Mr. Flanagin's office, Mr. Gunn, together with another Frank agent, Mr. Bowman Kreer, first met with Messrs. Gillogly and Beebe, at which time Mr. Gillogly read the "Silver Report". There is some conflict as to just what occurred at this meeting, although it seems clear that all parties were aware that Kemper did not want all of the then-going lineup of 99 stations. The Kemper representatives argue the proposition was an all-or-nothing one. ABC states, however, that Mr. Gillogly received the definite impression from Mr. De Mark that Kemper would proceed on the basis of the $22,000 package price and the lineup upon which said package price was based, and that Mr. De Mark was going to take the matter up with Mr. James S. Kemper, Sr., who was then out of the City. In any event, on the following day, April 18, 1962, Mr. De Mark sent a memorandum to Mr. Kemper in Palm Springs. This memorandum refers to the fact that Kemper and ABC had been negotiating with respect to "Evening Report" and it states, in part:

> In view of the fact that there are a number of important markets which are not now carrying the show and because of the 5:30 time period for the show in Chicago, we are recommending that we order the show on the basis of two times one week and one time the next week on an alternating week basis for a 26 week period contingent upon the following:

> include a list of stations that "must" carry the show and a change of time in Chicago. [The memorandum further stated that the cost would be approximately $950,000–$975,000, 39 segments at $22,000 per segment plus $3,000 for all of the "must" stations would be $975,000.]

> reserve the right to cut back to a one time per week basis at a cost of $24,000 per program with the cost of the additional stations to be added at the same pro-rated discount price. [The memorandum further stated that the cost would be $624,000 plus the additional stations. $24,000 x 26 is $624,000.]

It is significant that *no statement was made by Mr. De Mark in his memorandum to Mr. Kemper regarding stations which Kemper did not want.* On April 23, 1962, De Mark and Kemper discussed over the telephone Mr. De Mark's recommendation in his memorandum of April 18th, and Mr. Kemper approved the recommendation for sponsorship of Evening Report. Thereafter, on April 25, Mr. Gillogly telegraphed Mr. Slocum Chapin, his superior at ABC in New York, confirming that they had a "verbal order from Clinton Frank on behalf of Kemper Insurance for 39 quarter hours over 26 weeks of the Evening Report starting in October" and to "expect written order shortly." There is some conflict in the testimony as to who informed Mr. Gillogly of the "verbal order". Mr. Gillogly says it was Mr. Gunn, but the latter denies it. However, on the same date as Mr. Gillogly's telegram, Mr. Kemper wrote Mr. James C. Hagerty, a Vice President of ABC, stating that Kemper had "several problems, one of which is the time your show is on in Chicago; another the fact that your people have not been able to clear with a number of markets important to us, for example, Charlotte, North Carolina, and Rochester, New York." Again, no problem as to unwanted stations is mentioned. This letter would appear to have been written in response to the specific statement by Mr. De Mark in his memorandum of April 18th, that "if you approve our giving an order to ABC on the basis as outlined above, we would most appreciate your writing Mr. Hagerty calling attention to our problem

with specific reference to the poor time the show is carried in Chicago * * *."

A meeting was called at the Frank Agency for April 27th, for the purpose of resolving any remaining problems and preparing a draft order letter. Mr. Gillogly attended for ABC, together with Mr. Arne Nordmark, Sales Service Manager for ABC in Chicago, and Mr. De Mark, Mr. Gunn and Mr. Trude represented Kemper. Mr. Gillogly testified that Mr. Trude of the Frank Agency agreed to the ABC lineup at this meeting, although he also testified that up to the end of April 1962 he could not say that anyone had told him that Kemper had agreed to sponsor the "Evening Report" on any specified list of stations. According to Mr. Gillogly, "basically, they were agreeable to taking the ABC lineup, but what was really vital and critical to them was the additional fifteen markets which they felt they should have in order to make it an optimum advertising basis and cover as many of their key offices in the country in terms of doing business." Gillogly Deposition of Nov. 1, 1963, at 77. It was agreed at the meeting that although Kemper would order 39 segments of "Evening Report" over a 26-week period, it would have the right to reduce its order to one segment per week over the same period if within thirty days after the contract ABC could not clear all of the Kemper key markets. The price in the latter event for the 26 segments was to be $24,000 per segment rather than $22,000 for the 39 segments. However, once again there is disagreement as to the basic lineup exclusive of the additional stations desired by Kemper. ABC contends that the basic lineup for which the $22,000 and $24,000 figures were set was the then-going lineup, that Kemper agreed to pay a maximum of $3,000 for 15 of the 28 additional stations desired by Kemper, and that ABC agreed to furnish the other 13 at no charge.

On April 20, 1962, a week before the meeting just referred to, a representative of ABC's sales service department in New York sent to Miss Mary Alice Crisafulli, a "time-buyer" employed by the Frank Agency in Chicago, a copy of the current ABC network rate card. On the basis of this rate card, she made certain computations bearing a notation that they were prepared on April 27th, possibly for use at the meeting on that date. These computations reflected the time cost net of the then-lineup of 99 stations at $15,750.00, from which was deducted the 32 stations which Kemper did not want, for which the time cost net was figured at $2,871.23 (computed at a 47½ per cent discount, the same as that granted on the then-lineup when the $22,000 figure was quoted) and to which was added the net time cost of 15 stations then pending and which Kemper desired figured at $3,166.00 (again at the same discount) plus 5 "must" stations (similarly discounted) at $1,218.00, and 8 additional non-cleared stations (similarly discounted) at $1,204.88 or a total for the "then wanted" stations of $18,467.65. To this, Miss Crisafulli added gross programming charges of $5,882.50 (applying a 17.65 per cent commission rate rather than the 15 per cent rate) and gross networking charges of $500.00 for a total of $24,850.15 per segment on the basis of a Kemper selected 95 station lineup. While these computations were never submitted to ABC and cannot be considered as an offer by Kemper, nevertheless they are extremely significant in considering Kemper's offering letter of May 4, 1962, and the ensuing negotiations.[9] Also, assuming

9. Trude's affidavit of December 20, 1966, to the effect that Miss Crisafulli's computations were not reflected in the May 4 letter is not persuasive. In explaining the package time rate of $18,750.00 set forth in the May 4 letter, he states that this was reached by taking the discounted (47½ per cent) figure of $15,750.00 for the going lineup of 99 stations incorporated in the $22,000 ABC offer and adding to it the similarly discounted figure of $3,166 for 15 pending stations desired by Kemper to reach a figure of $18,916 which was subsequently modified to reflect $3,000 for the 15 pending stations and no charge for 13 "non-clear"

there had been no prior firm verbal order on the part of Kemper, they are evidence of the fluctuating nature of negotiations at that time.

On or about May 4, 1962, Mr. Trude, on behalf of the Frank Agency, delivered to Mr. Beebe the heretofore mentioned order letter which, if it did not deviate from, at least expanded substantially on, any agreements reached one week prior thereto on April 27th. The letter ordered "Evening Report" for 39 segments over a 26-week period for broadcast over a specific lineup of 95 stations, only 67 of which were among the 99 stations that had then cleared the program; the remaining 28 were the additional stations that Kemper wanted ABC to clear. The price per segment was not one lump sum, for it consisted of a $5,000 program charge, a $500 networking charge, and total time charges for the 95 stations listed in the attached ordered station lineup in an amount not to exceed $18,750 for a total of $24,250.00 (or for the 39 segments $945,750). The total time charge was to be reduced by the "package rate" of any station not clearing or carrying the program. The order letter referred to 41 "key markets" (12 of which were locations of Kemper branch offices) of which 29 had cleared the program as of that date and stated that "this order is contingent upon the clearance of these markets unless our client elects otherwise." However, it was also stated that if ABC could not clear all of the Kemper key markets by June 1, 1962, the order would revert to an order for one segment per week over a 26-week period and in this event, although the program and networking

charges would remain the same, the maximum time charges were to be $20,750 for a total of $26,250. In addition, Kemper was to have the right to cancel its sponsorship after the first 13 weeks upon 45 days' written notice.

It is the contention of ABC that Kemper had agreed at the April 27th meeting to pay a flat package price of $22,000 per segment for 39 segments over the then-going lineup of stations clearing the program plus a maximum of $3,000 time charges for the additional stations that Kemper wanted cleared, or a total of $25,000 per segment; and that what Kemper did in its May 4th order letter was to substitute 28 additional stations that it wanted cleared in place of 32 stations on the cleared then-going lineup, for which it agreed to pay $24,250 per segment for 39 segments even though the time charges for the 28 additional stations were over twice as high as the time charges for the 32 unwanted stations.[10] The day following the receipt of the letter of May 4th, Mr. Nordmark of ABC compared the lineup Kemper had ordered with the ABC going lineup of the February listing and saw at once that the order excluded many of the stations on ABC's going lineup, although he already knew that Kemper was not interested in all the ABC lineup. According to Mr. Nordmark, he told Mr. Trude

"that the lineup attached to the letter was not the lineup that was offered as part of the package deal offered by Mr. Scherick to Mr. Gunn in New York and that [he] did not know if the proposal would be accepted by ABC in New York because it differed from the original agreement. How-

stations which Kemper wanted, or $18,750.00. However, if his statement were correct it would mean that Kemper's offer in the May 4 letter was for 127 stations (99 going lineup plus 15 pending and 13 non-clear) whereas it was for 95 stations, or at most for 114 for which a charge was to be made. It does not appear likely that the $18,750.00 was reached without consideration of the discounted cost of the 15 pending and 13 non-clear stations (which formed part of

Miss Crisafulli's computations) since the May 4 letter provided that the $18,750.00 charge would "be reduced by the package rate of any station not clearing," which would have included the pending and non-clear stations.

10. According to Miss Crisafulli's figures, the discounted time charges of the 32 unwanted stations in the then-going lineup amounted to $2,871.23, whereas similar charges for the 28 additional stations amounted to $5,688.88.

ever, [he] stated that [he] would nevertheless forward it to New York." Nordmark Affidavit of June 3, 1965, at 3.

Mr. Beebe testified that he pointed out to Mr. Gunn that the proposal differed from the one that had been made to Kemper primarily because it was based on a lineup of stations different from the one upon which ABC's offer had been made, and that he told Mr. Gunn that at the package price quoted he did not see how stations could be eliminated but if they were eliminated, "it would cost" and that "we would have to renegotiate it." He further stated that he told Mr. Trude that Kemper bought the program on a package-price basis and that Kemper could not eliminate stations and pay the same package price. Mr. Gillogly testified that the May 4th letter was completely contrary to the agreement that they had reached at the meeting of April 27th, and that he directed Mr. Nordmark to so inform Mr. Trude and, in the meantime, to send the order letter to ABC in New York. Mr. Nordmark, in addition to talking to Trude and Gillogly, talked to Donald Flynn, an attorney at ABC in New York, and following such conversation made notes on his copy of the order letter of May 4th. The first two pages of the lineup specified by Kemper and attached to the order letter (together with the last 3 stations listed on page 3 of the said lineup) list 67 of the 99 stations then clearing "Evening Report" and the third page includes 28 additional stations that had not cleared the program but that Kemper wanted to order. Mr. Nordmark wrote this notation on the first page of the attached lineup. "No! to Pg. 1 & 2 of lineup—Then going lineup will negotiate on non Kemper markets." In the order letter itself, opposite the provision for an "ordered station lineup" of the 95 stations specified by Kemper, is Nordmark's notation "no—see attached lineup for comment" and where Kemper's order letter, at page 2, specified the gross time charges of $18,750 for the "ordered station lineup" Nordmark wrote "O.K.—

*But* based on 99 stations on our lineup plus Kemper 15 pending markets. See attached lineup." After making these notations (and others not relevant hereto) on the order letter, Nordmark forwarded the letter to ABC in New York. Nordmark further stated that he conferred by telephone with Mr. Henry Hede, Vice President and Administrative Sales Manager, and other ABC representatives in New York to advise that Kemper had requested a specific list of stations rather than all stations carrying the program. Mr. Hede then spoke to Mr. Scherick and was told by him that his (Scherick's) original proposal was based on the sale of the ABC going lineup, and that if Kemper insisted on its ordered lineup it would have to revert to rate-card rate. However, even assuming that it was not a basis for further negotiation, there is dispute as to what the cost per segment would have been had Kemper reverted to ABC rate-card charges for the 67 wanted stations, particularly since these stations were, for the most part, included in stations already in ABC's going lineup, and it is not clear whether the rate-card price was to apply to stations in the going lineup as well as those not presently a part of it. Kemper argues that the 67 wanted stations, based on ABC's rate card, would have totaled $30,490 per segment, to which should be added the program charge and commission of $5,750 and network charge of $500 or a total of $36,740 which would be reduced to $35,521 on a 26-program basis or $34,215 on a 39-program basis. Kemper further argues that the 15 pending stations, offered as part of the package deal at $3,000, would cost $6,000 at the rate-card rate (not conceded to be true) and that if the 15 stations were added to the 67, at rate-card rates, each program would cost $42,470, which, after dollar value discount on time charges, would total $41,290 per program for 26 programs and $40,960 per program for a series of 39.

Subsequent to the receipt of Kemper's order letter of May 4, 1962, Mr. Irish, in

charge of processing orders for ABC, on May 8th directed the Sales Service Department to order up immediately the 99 stations then broadcasting "Evening Report" for sponsorship by Kemper. Miss Stamatis, Manager of night time television sales service, prepared a Facilities Order, dated May 10th, which ordered "the then going ABC lineup" for Kemper sponsorship beginning October 15, 1962. On May 11th, telegrams were sent to the 32 stations which Kemper had indicated in its May 4th order letter that it did not want, "recapturing" the commercial time for 3 segments of $\frac{1}{4}$ hour in each two-week period for 26 weeks beginning October 15, 1962. The 28 stations which were ordered in addition to the going lineup, not having previously cleared the program series, were not yet subject to any recapture conditions, and ABC by telegram dated May 11, 1962, invited them, rather than directed them, to carry the program. Under the offer, of course, the stations were free to reject the entire order but not to accept the program and reject Kemper as sponsor. The Facilities Order and the telegrams of May 11, 1962 were in conformity with ABC's letter of May 10, 1962 (hereinafter referred to), replying to Kemper's order letter of May 4, 1962, and, according to ABC, also in conformity with the agreement reached at the meeting of April 27, 1962.

ABC's letter of May 10, 1962 acknowledged receipt of Kemper's letter of May 4, 1962 and confirmed ABC's "firm order therein * * * of * * * the KEMPER INSURANCE COMPANIES, for sponsorship of ABC EVENING REPORT * * *." Such sponsorship was to be of 39 one-quarter hours over a 26-week period commencing with the week of October 15, 1962. The letter stated that Kemper's "station line-up" would "consist of the then going lineup of ABC basic affiliated stations carrying the program as of each telecast of which you are a sponsor." The time charges were to be a flat $15,750.00 per segment

for a 39-segment program, or if Kemper reduced its sponsorship to one segment per week for 26 weeks because of ABC's inability to clear all of the 41 Kemper key markets, the time charges were to be $17,750.00 per segment. In each case the program charge of $5,750 and network charge of $500 were to be added. In addition, ABC agreed to order on Kemper's behalf 15 additional stations, specifically identified with their individual time charges (apparently substantially below rate card) at $3,000, plus 13 other stations for which Kemper was not required to pay any additional time charges. With respect to the additional 15 stations Kemper was required to pay only for those actually clearing the program. Accordingly, the maximum total price per segment for sponsorship of 39 segments under the May 10th letter was $24,250 or for 26 segments it was $26,250 per segment. *These totals are the same as those set forth in Kemper's order letter of May 4th.*

There is testimony that following receipt of ABC's letter of May 10, 1962, Mr. Nordmark went to ABC's offices in New York on May 14th or 15th, and spoke to Mr. Hede, Jr., and various other ABC personnel. It is Kemper's position that Mr. Nordmark was advised by Mr. Gillogly that Kemper could have the lineup attached to their letter of May 4th only if they paid the full rate-card rate. This is disputed by ABC which asserts that it never made the decision that Kemper would have to pay the rate-card time charges, and nothing less, if it wanted to sponsor the program over its lineup of stations carrying the program or that Kemper could have its own lineup only if it paid the rate-card rates. There is no evidence that during the period in question ABC had any policy or practice that any discount would not be available to a sponsor unless certain stations were ordered as a group, or that certain stations would not be available or the sponsor entitled to a discount un-

less the sponsor ordered a minimum number of stations.[11]

Thereafter, on May 18th, a meeting was called at the office of the Frank Agency to go over the differences between the Kemper order letter of May 4th and the ABC reply of May 10th. ABC was represented by Nordmark and Beebe, Kemper by De Mark and his assistant, Bruce Robertson, and the Frank Agency by Gunn and Trude. Mr. Nordmark, on behalf of ABC, claims that he told the representatives of the Frank Agency at that meeting "that if Kemper did not want certain markets on the then-going lineup it could either select its own stations and pay the rate card time charges for each station *or* it could go back to New York and renegotiate the deal with Mr. Scherick" and "that Kemper could not have both the package price quoted by Mr. Scherick and a lineup of stations that differed from the lineup which was part of the package price." Nordmark Affidavit of June 3, 1965, at 4. (Emphasis added.) Mr. Nordmark further claims that he told Mr. Trude that if Kemper did not order some of the stations on the then-going lineup its commercials would have to be "blacked out" over said stations, which would cost Kemper more money. Mr. Beebe, on behalf of ABC, testified that he told De Mark, Trude and Gunn at this meeting that it was difficult to eliminate markets, that ABC would have to contact each affiliate, and that Kemper would have to give up visual identification with the commentator. Kemper's position, according to Mr. De Mark, was that it didn't want certain markets (stations) because of lack of representation and in some cases because it would constitute an overlapping of coverage.

Following the May 18th meeting, De Mark prepared a memorandum for Mr. Kemper dated May 21, referring to the "three hour meeting with ABC to discuss the problems which arose out of our order letter and ABC's acceptance letter", and at which time they (Kemper and ABC) "went into the many ramifications of the order." *No mention was made of any problem concerning the lineup,* the only items mentioned being the products of possible co-sponsors and not "pushing" the program to specific advertisers. De Mark requested a conference "to discuss this" with Mr. Kemper, which discussion apparently took place on May 23d, and the results of which were confirmed to Mr. Kemper by De Mark by memorandum dated May 24, 1962. As stated by De Mark, "On the basis of our discussion yesterday, we will get together with ABC on the purchase of the EVENING REPORT for 1 night a week for 26 weeks without 'cross plugging' on any night." The only matters reported to have been discussed were "co-sponsor compatibility", what items would be advertised by Squibb Products, the time taken by other purchasers (Squibb, U. S. Plywood, and American Tobacco), and the refusal of ABC to provide a cancellation clause "because Squibb and U. S. Plywood had purchased on a firm basis for 26 weeks and it was on this basis that ABC believes it can increase its network station line-up." *No mention is made in the memorandum or in De Mark's hand-written notes of that meeting of any discussion concerning the purchase of unwanted markets or an attempt to negotiate on the basis of the lineup annexed to Kemper's May 4th order letter.* Referring to his recapitulation of the matters discussed by him with Mr. Kemper at the May 23d meeting, De Mark stated, "On the basis of the above, you then told me we should buy 1 night a week and 'be on by ourselves.'"

11. ABC, during the period relevant hereto, did not have any policy or practice that any TV station would not be available unless ordered as a part of a group of stations, or that any discount would not be available unless certain stations or a minimum number of stations were ordered, and it did not authorize its sales agents to impose such practice or procedure. It did have the policy and practice of refusing an order or denying a discount unless the sponsor ordered a sufficient number of stations such that the charges made by ABC for such stations reached a specified minimum sum.

Thereafter, the Frank Agency prepared a draft order letter, dated June 1, 1962, which cancelled and superseded the May 4th order letter and provided for sponsorship by Kemper over what was referred to as "the then-going lineup of ABC affiliated stations" plus the 28 additional stations Kemper wanted, although it provided that Kemper would not be required to accept any additional stations added to the then-going lineup after the date of the order. Since Kemper wanted to buy a set list of stations, an ordered station lineup was attached to the draft order letter submitted to De Mark. De Mark's typewritten comments regarding this draft *do not indicate that Kemper did not wish to sponsor over some of the stations in the attached lineup*. Furthermore, the draft was prepared by the Frank Agency on behalf of Kemper. The draft order letter was put in final form under date of June 5, 1962, and sent to ABC. The principal difference between this order letter and ABC's letter of May 10th is the fact that it was based upon an attached station lineup (as was Kemper's May 4th order letter) as distinguished from a "then-going lineup" and it was for only 1 segment per week over a 26-week period. The station lineup was to "consist of the then-going lineup of ABC affiliated stations", the time charges for which were not to exceed $17,750 per segment. However, this was not an order for a "then-going lineup" because Kemper was not required to accept any additional stations other than those shown as Group I on the attached ordered lineup, whereas an actual then-going lineup would have included all stations actually carrying the program on each date when Kemper's commercials were scheduled to appear. Included also in the lineup were the 15 additional stations (Group II of the ordered lineup) for which Kemper was to pay a maximum of $3,000 time charges per segment, which charges were to be reduced by the individual time charges of stations failing to clear, plus the 13 stations (Group III) for which no charge was to be made to Kemper. Individual station time charges were set forth only for the 15 Group II stations. Program and networking charges of $5,000 and $500, respectively, remained unchanged. ABC guaranteed a coverage of 75 per cent of all United States television homes in the lineup under Groups I and II with a credit to Kemper equal to the percentage points of actual coverage less than 75 per cent. On June 12, 1962, by telegram, ABC accepted the order of June 5, 1962, subject to certain clarifications. The telegram stated that the ordered lineup should consist of the then-going lineup as set forth in Group I of the lineup attached to the June 5th letter, the time charges for which would be in accordance with ABC's rate card less a 38 per cent discount, but not in excess of $17,750.00; that the 15 additional stations (Group II) were to be at rate card less a 45 per cent discount, but not to exceed $3,000.00; and that Kemper would "now be billed applicable time charges" to be automatically reduced by any non-clearance of stations. Thus ABC acceded to Kemper's desire to sponsor the program over an ordered station lineup as distinguished from the then-going lineup, and granted Kemper a concession as to the flat package time charge for the then-going lineup. Following ABC's acceptance telegram of June 12th, it issued a Facilities Order on June 13th stating that instead of ordering the then-going lineup for Kemper, ABC would order a specific list of stations "shown on attachment. It is understood that client does not have to accept any additional stations that we may add to the program if they do not have representation in those markets. We have agreed to black-out their commercials from any such stations at no cost to them." On the same date, as previously noted herein, ABC issued another "Evening Report" offering sheet referring to a 100-station cleared lineup, a total price of $36,250 per segment and making no provision for any special discounts.

On June 25, 1962, Trude of the Frank Agency wrote De Mark of Kemper, recapping the Agency's current negotia-

tions with ABC. In his letter he indicated that the discount with respect to the Group I stations, previously computed at 38 per cent, would be recomputed at 42½ per cent to bring it to the agreed figure of $17,750.

On June 28th, De Mark sent a further memorandum to Mr. Kemper. Neither Trude's letter nor De Mark's memorandum *mentions any "unwanted markets" or any attempt to negotiate a price for the lineup.* Reference is made in De Mark's memorandum to the "back and forth discussions with ABC with regard to our order letters and ABC's acceptance letters", and that Kemper had "submitted two order letters to ABC replete with conditions and they have, as might be expected, sent us acceptance letters which were just as filled with conditions." De Mark stated that ABC's New York office was going to send "a currently cleared list of 96 stations", and there are various references to additional markets that Kemper wanted cleared. However, *there is no indication that Kemper felt it was being required to accept stations it did not want.* On July 3d, Mr. Trude of the Frank Agency sent to De Mark of Kemper a document entitled "ABC Evening Report—Terms of Agreement" and stated in the covering letter: "I have tried to incorporate all of the order letters, acceptance telegrams, and verbal conversations between you and ABC" (which apparently was intended to mean between Mr. De Mark and Mr. Trude). *Neither the letter nor document made any reference to unwanted markets.* On July 13, 1962, another memorandum was sent to Mr. Kemper from De Mark referring to the former's approval of the program on a sole sponsorship basis but noting that the Executive Committee had not approved the expenditure which would "range from $666,000 to $684,000 depending on the number of stations which have cleared and will probably clear the show."

On July 17, 1962, ABC sent a formal acknowledgment letter to the Frank Agency which was characterized as a proposed agreement that was "the result of extended negotiations between our [ABC's] Chicago office and your agency and we believe represents the entire understanding between us." The time charges set forth therein were based upon ABC's rate card less a special 42½ per cent discount for the Groups I and III stations, and a special 50 per cent discount for the Group II stations; there was no maximum dollar limitation for the time charges. On July 18, 1962, De Mark sent an interoffice memorandum to Mr. Flanagin regarding, among other matters, the "Executive Committee Expenditure Approval" which stated:

On May 23 I discussed the purchase of the show with the Board Chairman and he said "buy one night a week and be on by ourselves." He subsequently approved this in my memo of May 24 (copy to you). Further, I wrote him on June 28 (copy to you) telling him about the additional major stations that have cleared and at his request discussed that memo with him on July 2. His only query at that time had to do with cost. And when I reconfirmed what I had told him on May 23 he said "OK". * * * ABC would not give us a cancellation clause. Mr. Kemper was informed of this and said "OK" and this was one of the reasons he said to buy on one night per week basis.

*No reference was made to unwanted stations.*

On July 24, 1962, Kemper's Executive Committee unanimously authorized the expenditure of between $666,000 and $684,000 for the purchase of "Evening Report" on a sole sponsorship basis one night per week for 26 weeks. Shortly thereafter, on July 27th, Mr. Flanagin sent an interoffice memorandum to Mr. Kemper stating that

at the time the Executive Committee approved the purchase of ABC-TV Evening Report Mr. H. G. Kemper mentioned some real reservations about the show and I know that you already had expressed some reservations. I also lack some enthusiasm about the show in part because news shows do

not have the same merchandising qualities that our golf show had and also because of the time spot this particular show has in Chicago. I do nevertheless feel that the show represents a good sound dollar value for us within a budget which by present day TV standards is very limited. * * * Incidentally, the Frank people feel that we have gone so far in the negotiations that even though no contract has been signed we have legally made a commitment.

Clint Frank and his fellows again reviewed the thinking behind the purchase of the show and I attach a copy of his letter to me of July 26 outlining the basic reasons why the agency feels this purchase is a sound one.

The letter referred to, dated July 26, although containing Frank's signature, was apparently written either by Gunn or Trude, both of whom were familiar with the negotiations between ABC and Kemper. It was a detailed review of the agency's original recommendation and the subsequent negotiations with ABC and states that "our recommendation was based on the fact that this show could be expected to deliver a considerably larger number of advertising impressions for the dollars available than any other offered by any of the three networks within reach of our budget." It set forth five advantages of the program: (1) "This program offers excellent advertising continuity * * *"; (2) "the audience for this program has shown steady growth * * *"; (3) "ABC Evening Report fulfills our need better than any other available television program * * *"; (4) "the price we were able to obtain through extensive negotiations with ABC makes Evening Report an excellent advertising value"; and (5) "we certainly plan to obtain as much merchandising value out of your sponsorship of Evening Report as possible" (referring to various plans worked out with ABC for newsletters, an appearance by Jim Hagerty, and other merchandising ideas). Three "drawbacks" were mentioned with respect to the program: (1) "It does not offer the opportunity for some of your agents and policyholders to attend and participate in actual programs as did All Star Golf"; (2) "a straight news program does not lend itself to the kind of promotional gimmicks and premiums you have been able to utilize to some extent with the golf show such as golf balls, playing tip booklets, score cards, etc."; and (3) "the Chicago time period for the program is not ideal." As to each of the "drawbacks", the Frank letter indicates that there are countervailing factors to be considered. *Of greater significance is the fact that the present claim of Kemper that it was forced to take undesired stations is nowhere mentioned or inferred, nor is there any mention of any kind of unwanted stations or of ABC's alleged refusal to allow Kemper to sponsor the program over the 95 stations that it wanted.*

As the Frank letter stated:

after an honest and openminded reevaluation of the pros and cons, we believe this program will give you more of the things you need within the limits of your budget than any other available to us: a large audience per dollar expended; a broad audience of adult males; an excellent atmosphere for a wide range of commercials; a prestige program; and above all, excellent continuity of commercial impressions.

* * * * * *

I certainly hope that you will have an opportunity to go over this matter with the members of your Executive Committee and give them the benefit of the facts and thinking both pro and con that went into our recommendation.

The final contract, dated August 15, 1962, and under attack herein, provided for Kemper's sponsorship of "Evening Report" one day per week during a 26-week period commencing October 17, 1962, over an ordered station lineup attached to and forming a part of the contract. Kemper was given the right to "accept or reject any additional stations

to the lineup shown on the attached ordered station lineup." The provision for the $17,750.00 maximum was removed. The lineup was divided into three groups. Group I consisted of 102 stations specifically named and identified. Of this group, 67 were originally "ordered" by Kemper in its letter of May 4th, and 35 were stations most of which Kemper indicated in its letter of May 4th that it did not want. Comprising Group II were 15 stations specifically named and identified in the contract, most of which were not clearing the program at the time the contract was signed but which Kemper desired and with respect to which there was a reasonable likelihood of clearance. Finally, Group III consisted of 13 stations specifically named and identified in the contract which were not clearing the program at contract time but which Kemper wanted although it was unlikely they would clear prior to the commencement of the program. Individual time charges for each station were set forth in terms of each station's Class "A" hourly rate based on the June 5, 1962 hourly rate. As heretofore noted, the rate-card charge for a 15-minute program such as "Evening Report" was 40 per cent of each station's hourly rate. The contract provided that with respect to Groups I and III the time charges computed as indicated above would be subject to a special $42\frac{1}{2}$ per cent discount, subject to agency commission, whereas the similar charges for the Group II stations would be subject to a special 50 per cent discount. The program cost of $5,000 and network charge of $500 were maintained. Kemper had the right to accept or reject any additional stations to the lineup shown on the attached "ordered station lineup", and as a matter of fact subsequent to the execution of the contract of August 15, 1962, Kemper both ordered and rejected additions to the lineup. Subsequent to the execution of the contract of August 15th "Evening Report" was broadcast under Kemper's sponsorship on October 17, 26 and 31 and November 9, 1962. Kemper's commercials were broadcast over only those stations that Kemper ordered.

However, on Sunday, November 11, 1962, ABC broadcast a program entitled: "The Political Obituary of Richard M. Nixon" which caused considerable editorial comment in the nation's press because of the appearance of Alger Hiss on that program. On November 13, 1962, Kemper advised ABC that it was cancelling its sponsorship of "Evening Report" and on November 14 delivered a formal notice of cancellation. After some attempts to reconcile their differences, ABC on January 9, 1963 instituted suit against Kemper in the N. Y. Supreme Court for breach of contract. Two days later, Kemper issued a press release explaining why it had cancelled its sponsorship, namely, the appearance of Alger Hiss on the aforesaid program which, according to Kemper, adversely affected its image as a sponsor of the ABC news broadcast. Two and one-half pages of the three-page press release were devoted to comment on the Hiss event with the remainder concerning the statement "the package that we thought we had bought at the start of the 1962–63 season no longer is the same, and we should not be required to pay for what is damaging to us." Nowhere in this statement, made almost two months after cancellation of the sponsorship, is there any reference to any economic coercion practiced by ABC on Kemper during the contract negotiations nor is there any reference to any violation by ABC of the anti-trust laws. Kemper's answer to ABC's amended complaint in the State Court action and its complaint in the present action filed at approximately the same time contain the first reference of any kind to Kemper's contention that it was coerced into sponsorship by an illegal tie-in arrangement. One of the numerous defenses set forth in Kemper's answer in the State Court alleged that the contract of August 15, 1962 was illegal and thus unenforceable because it constituted a tie-in sale in violation of the Sherman Act. This defense was dismissed on September 5, 1963 by the State

Court. American Broadcasting-Paramount Theatres, Inc. v. American Mfrs. Mut. Ins. Co., 42 Misc.2d 939, 249 N.Y.S. 2d 481 (Sup.Ct.1963), aff'd on opinion below, 20 App.Div.2d 890, 251 N.Y.S.2d 906 (1st Dep't 1964), aff'd mem., 17 N. Y.2d 849, 218 N.E.2d 324, 271 N.Y.S.2d 284, cert. denied, 385 U.S. 931, 87 S.Ct. 1, 17 L.Ed.2d 37 (1966). A final judgment was also rendered for plaintiff ABC in the State Court on March 18, 1965, 48 Misc.2d 397, 265 N.Y.S.2d 76 (Sup. Ct.), aff'd on opinion below, 24 App.Div. 2d 851, 265 N.Y.S.2d 577 (1st Dep't 1965), aff'd mem., 17 N.Y.2d 849, 218 N.E.2d 324, 271 N.Y.S.2d 284 (1966). Final judgment was entered for $265,-047.21. By amendment to its complaint in the instant action, Kemper has included said amount as additional damages to be trebled under Section 4 of the Clayton Act. Initially, Kemper sought treble damages based upon the time charges of $6,841.35 which it had to pay for the "unwanted" stations. (Complaint ¶ 32(a)).

### The Applicable Statutes

Section 1 of the Sherman Anti-Trust Act, 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1964), provides in pertinent part that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

Section 4 of the Clayton Act, 38 Stat. 731 (1914), 15 U.S.C. § 15 (1964), authorizes suit by any person "injured in his business or property by reason of anything forbidden in the antitrust laws" and further provides that he "shall recover threefold the damages by him sustained".[12]

■ Initially, it should be observed that civil actions for anti-trust violations by radio or television stations are cognizable and entitled to decisions on their merits in the Federal Courts. Packaged Programs, Inc. v. Westinghouse Broadcasting Co., 255 F.2d 708, 709 (3d Cir. 1958).

### The Burden of Proof

■■ The burden of proving that a contract is illegal is upon the party asserting it—in this case, plaintiff. Associated Press v. Taft-Ingalls Corp., 340 F.2d 753, 759 (6th Cir.), cert. denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965); Palmer v. Chamberlin, 191 F. 2d 532, 539, 27 A.L.R.2d 416 (5th Cir. 1951); Illinois Sur. Co. v. O'Brien, 223 F. 933 (6th Cir. 1915). Accordingly, plaintiffs alleging an illegal tying arrangement must prove by a preponderance of the credible evidence that defendant agreed "to sell one product but only on the condition that the buyer also purchases a different (or tied) product". Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ It is important to recognize that not every contract, combination or conspiracy in restraint of trade or commerce is illegal. The intent of Congress was "not to restrain the right to make and enforce contracts * * * which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods * * which would constitute an interference, —that is, an undue restraint." Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 60, 31 S.Ct. 502, 515, 55 L. Ed. 619 (1911). The "standard of reason", it has been held, "was intended to be the measure used for the purpose of determining whether, in a given case a particular act had or had not brought about the wrong against which the statute provided." Ibid.

■ Despite plaintiffs' assertion to the contrary, tying arrangements are not

---

12. In Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961), the Court, in reversing the summary dismissal of a private anti-trust suit alleging violation of § 1 of the Sherman Act, said that "to state a claim upon which relief can be granted under that section, allegations adequate to show a violation and, in a private treble damage action, that plaintiff was damaged thereby are all that the law requires."

illegal per se. Susser v. Carvel Corp., 332 F.2d 505, 518 (2d Cir. 1964) (concurring opinion), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). As stated by this Court in Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co., 220 F.Supp. 784, 788 (S.D.N.Y.1963):

> "Thus it seems that, despite earlier statements that tying arrangements are illegal per se, they are 'not necessarily so.' We conclude, therefore, that tying arrangements are not per se violations of Section 1 of the Sherman Act. They become violations of Section 1 if (1) the seller has sufficient economic power with respect to the tying product, such as monopoly, market dominance, patent, copyright, unique attributes, distinctiveness or consumer appeal, to exert economic leverage to induce his customer to take the tied product along with the tying item, and (2) a substantial volume of commerce in the tied product is restrained." (Citations omitted.)

Or, as stated in Northern Pac. Ry. v. United States, supra 356 U.S. at 6, 78 S.Ct. at 518:

> They [tie-ins] are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected.

Tying arrangements "may fall" in the category of per se violations, "though not necessarily so." White Motor Co. v. United States, 372 U.S. 253, 262, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

■ Furthermore, business arrangements which conceptually might be styled as tie-ins may be "exculpated from the reach of the anti-trust laws if the arrangement was actuated by or could be explained on the basis of a legitimate business justification as opposed to an improper motive". Baker v. Simmons Co., 307 F.2d 458, 468 (1st Cir. 1962); see Susser v. Carvel Corp., supra, 332 F.2d at 519; Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1st Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961); Bascom Launder Corp. v. Telecoin Corp., 204 F.2d 331, 335 (2d Cir.), cert. denied, 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953).

■ "However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pac. Ry. v. United States, supra 356 U.S. at 5, 78 S.Ct. at 518. Among such practices are tying arrangements. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Since true tying arrangements "serve hardly any purpose beyond the suppression of competition", Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949), a conclusive presumption of unreasonableness and consequent illegality "avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved". Northern Pac. Ry., supra, 356 U.S. at 5, 78 S.Ct. at 518. However, as has been hereinbefore mentioned and as will be more fully developed shortly herein, all tying arrangements are not conclusively unreasonable restraints and as such illegal per se.[13]

Any meaningful discussion of the application of the anti-trust laws condemning tying arrangements, more particularly the Sherman Act, to television program

---

13. The per se rule is not binding "as to any set of facts not basically the same as those in the cases in which the rule was applied." United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 556 (E. D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200 (1961).

sponsorship should commence with a brief recapitulation of past developments in this area. Tying arrangements were first condemned as a matter of patent law. As noted by Professor Turner in The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L. Rev. 50, 51–52 (1958), ever since Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917), the Supreme Court has consistently ruled that arrangements tying unpatented supplies to patented machines were beyond the scope of the monopoly granted under patent law. This same principle was later extended to the licensing of a process, method or combination patent. Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 37 (1938); Carbice Corp. of America v. American Patents Dev. Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931). These cases were infringement cases where initially the Court held that the patentee could not maintain an infringement action against a person who bought another seller's supplies, or against the other seller for "contributory" infringement, because neither was infringing the patent. Subsequently, the consequences of such tying arrangements were broadened into a full-fledged patent misuse doctrine and the patentee could get no relief even against a direct infringer. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 403, 86 L.Ed. 363 (1942).

While it is true that reference to the anti-trust laws appears in the infringement cases, patent tying arrangements were not specifically denominated as anti-trust violations per se, but rather as excessive or improper uses of the statutory patent monopoly. Cf. Mercoid Corp. v. Minneapolis Honeywell Regulator Co., 320 U.S. 680, 684, 64 S.Ct. 278, 88 L.Ed. 396 (1944). However, in International Salt Co. v. United States, supra, the Court determined that for all practical purposes patent tying arrangements were illegal per se, provided only that they foreclosed a dollar amount of commerce that "cannot be said to be in-

significant". 332 U.S. at 396, 68 S.Ct. at 15. As indicated by Professor Turner, while it is not clear whether in *International Salt* the existence of a patent as the tying product conclusively showed "dominance" in the relevant market, leaving dominance to be proved in non-patent cases, or whether "distinctiveness" rather than "dominance" was to be the relevant factor, Turner, supra at 53, it seems clear that in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) "distinctiveness" rather than "dominance" was to be the test. *Paramount Pictures* involved among other things the block-booking of copyrighted films. The Court approved the action of the District Court in enjoining this practice, the result of which was "to add to the monopoly of the copyright in violation of the principle of the patent cases involving tying clauses." 334 U.S. at 158, 68 S. Ct. at 929. However, the Court did not "suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film." Id. at 159, 68 S.Ct. at 930.

In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), a non-patent case, the majority of the Court held that a tying arrangement of advertising space in morning and afternoon newspapers was not illegal because the tied products were identical, and because there was no market dominance in the tying product. The evidentiary distinctions between establishing a tie-in violation under the Clayton Act as distinguished from the Sherman Act were synthesized by the Court in the following terms: A tying arrangement will violate the Clayton Act "[w]hen the seller enjoys a monopolistic position in the market for the 'tying' product, *or* if a substantial volume of commerce in the 'tied' product is restrained", id. at 608, 73 S.Ct. at 880, and the practice will contravene the Sherman Act "whenever both conditions are met." Id. at 609, 73 S.Ct. 872. As thus formulated, a more demanding bur-

den of proof was required under the Sherman Act. However, in Northern Pac. Ry. v. United States, supra, also a non-patent case, the Court reverted from the requirement of demonstrating the market dominance or "monopolistic" position of the defendant and substituted the less demanding test of a "sufficient economic power to impose an appreciable restraint on free competition in the tied product (assuming all the time, of course, that a 'not insubstantial' amount of interstate commerce is affected)." 356 U.S. at 11, 78 S.Ct. at 521.

Finally, in United States v. Loew's Inc., 371 U.S. 38, at 45, 83 S.Ct. 97 at 102, 9 L.Ed.2d 11 (1962), the watered-down *Times-Picayune* test was abandoned and the Court stated:

> "Market dominance—some power to control price and to exclude competition—is by no means the only test of whether the seller has the requisite economic power. Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." (Footnote omitted.)

Against the foregoing background, I proceed to the issues involved herein.

### What Kemper Must Prove

In order to succeed, Kemper must prove

(a) the existence of a tying arrangement as defined by law to which arrangement Kemper was compelled to become a party;

(b) that ABC had "sufficient economic power to impose an appreciable restraint on free competition in the tied product", Northern Pac. Ry. v. United States, supra, 356 U.S. at 11, 78 S.Ct. at 521;

(c) that a "not insubstantial" amount of interstate commerce was affected; and

(d) failing proof of (b) and (c), that the tying arrangement constituted an unreasonable restraint.

### Was There a Tying Arrangement?

ABC contends that the facts of the case demonstrate there was no "tie-in" sale as alleged in the complaint due to (a) the complete absence of separate "products" or "services" within the meaning of anti-trust case law, and (b) the complete absence of the necessary element of coercion sufficient to support the concept of such a sale under such law.

The Supreme Court has stated in Times-Picayune Publishing Co. v. United States, supra, 345 U.S. at 614, 73 S.Ct. at 883, that the "common core" of unlawful tying arrangements "is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market."

A tying arrangement has also been defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product * * *." Northern Pac. Ry. v. United States, supra, 356 U.S. at 5, 78 S.Ct. at 518.

In Times-Picayune Publishing Co. v. United States, supra, the defendant publishing company published both morning and afternoon papers in New Orleans. The only other newspaper was an afternoon competitor. The Government contended that there was an unlawful tying arrangement whereby certain advertisers were required to advertise in both the morning and afternoon papers published by defendant. The Supreme Court held, however, that defendant was engaged in the sale of a single product, i. e., readership,—and since only one product was involved, there was no tying arrangement. The Court held that

> "two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant 'tying' product exists (in fact, since space in neither the Times-Picayune nor the States can be bought alone, one may be viewed as 'tying' as the other); no leverage

in one market excludes sellers in the second, because for present purposes the products are identical and the market the same." 345 U.S. at 614, 73 S.Ct. at 883.

While it is perhaps true that the effect of the *Times-Picayune* case has been limited to its precise facts by Northern Pac. Ry. v. United States, supra, such limitation has in no way affected the requirement that there be a *"second distinct commodity"* which must be purchased along with the "dominant 'tying' product", *Times-Picayune*, supra, or that there must be a sale of "one product but only on the condition that the buyer also purchases a different (or tied) product", *Northern Pac. Ry.*, supra. No case has been cited to the Court or discovered by independent research wherein a tying arrangement was found to exist between identical products. As stated by Professor Pearson,

> "Implicit in the definition is the requirement that the tied product be different from the tying product. If there is only one product involved, there is no tie-in, but simply a situation involving seller's selection of the best unit size. * * * Even where there are some physical differences, custom and usage may lead to the conclusion that no tie-in exists." Pearson, Tying Arrangements and Antitrust Policy, 60 Nw.U.L.Rev. 626, 627 (1965).

Or, as stated by Professor Turner,

> "The requirement that they be 'different' [products] obviously cannot be dropped out. Every manufactured item is a combination of various materials and components. There are obvious cases in which we would say either that there is no tie-in because the object of sale is a single product, or that if there is a tie-in, it should

not be deemed illegal per se or even illegal at all. * * * That the products are often or even 'normally' produced and sold separately is not * * a wholly satisfactory test." Turner, supra at 67–68.

It is necessary to "take into account the fact that the antitrust laws too are supposed, among other things, to protect and encourage progressiveness and innovation, which means that there must be some room for the innovating combination of elements, 'normally' produced and sold separately, into new single products." Id. at 68.

ABC relies on Columbia Broadcasting Sys., Inc. v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir.1961), cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed. 2d 612 (1962), and on *Times-Picayune*, supra. In *Amana*, plaintiff CBS sued the sponsor of one of its network programs for monies due in which action defendant counterclaimed for treble damages for alleged Clayton Act violations. Amana alleged that CBS had violated Section 2(a) of the Clayton Act, 49 Stat. 1526 (1936), 15 U.S.C. § 13(a) (1964), by granting quantity discounts to other sponsors including Amana's competitors, and that CBS had violated Section 3 of said Act, 38 Stat. 731 (1914), 15 U.S.C. § 14 (1964),[14] by requiring, as a condition of network broadcasts, that Amana "purchase network time" over a specified group of television stations, 51 in number, which included all of the stations owned and operated by CBS and certain affiliated stations, and, further, that CBS refused "to sell network time" of Amana's choice unless the latter agreed to sponsor a program, "The Phil Silvers Show", in which CBS had a financial interest. The District Court had dismissed the counterclaim for failure to state a claim upon which relief could be granted. While the affirmance by the

---

14. The fact that *Amana* was brought under § 3 of the Clayton Act, rather than under § 1 of the Sherman Act, would not seem to affect the weight to be given to the Court's characterization of the sponsorship contract. Indeed, the District Court, Court of Appeals, and Supreme Court had authority to find that Amana's counterclaim stated a cause of action under the Sherman Act, if the facts warranted such relief. Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir. 1957).

Appellate Court was based primarily on its interpretation of the word "commodity" in the applicable statutes, it is significant that it found that transaction could not be accurately characterized as a sale of television time or as merely a contract for services.

"While the CBS Network Rate Card #11, attached to the initial answer as Exhibit I, and incorporated by reference in the counterclaim, discloses that the time duration of the broadcast is used to measure its cost to the sponsor we are of the opinion that the reasonable inferences to be drawn from the allegations concerning the written agreements do not admit of the transaction being accurately characterized as a 'sale' of television 'time' as it is labeled by Amana nor as merely a 'services' contract as argued by CBS. Although both services and time are involved we conclude that in its essence the contract alleged is *a purchase by Amana of the privilege of having itself identified as sponsor of the program broadcast and making use of the permissible portion thereof for advertising its products.*" 295 F.2d at 377–378. (Emphasis added.)

While there has been criticism of the decision by commentators, such criticism has been directed to the narrow definition of a commodity rather than to the characterization of the type of transaction involved herein, and Amana is still authoritative as to both definitions. Tri-State Broadcasting Co. v. United Press Int'l, Inc., 369 F.2d 268 (5th Cir. 1966).[15] Kemper's attempt to characterize the language of *Amana,* quoted above, as "outright dicta" and "completely inconclusive" seems hardly warranted. CBS in its brief in the Appellate Court specifically argued that not only were "commodities" not involved but that there was no tie-in as only one package of services was contracted for. Brief for Appellee, pp. 53–66, Columbia Broadcasting Sys., Inc. v. Amana Refrigeration, Inc., supra. Nor, on the basis of such criteria as have been suggested, even if we assume that the transaction can be characterized as sales of stations or television time, is it unreasonable to find, not only in Amana but in the instant case, that only one product is involved.[16] These criteria of separability, laid down in United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 559 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 200 (1961), may be summarized as follows: (1) Did competitors of the seller offer all the components of the alleged "product" separately and not exclusively as a single package? (2) Was the number of components of

15. Judge Geller, in the State Court action between the parties, recognized the character of a sponsorship contract as defined in Columbia Broadcasting Sys., Inc. v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir. 1961), cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962): "Its essential characteristic is that it is a form of advertising and damages for a breach thereof should be governed by the rule applicable to advertising contracts generally. Moreover, the subject matter—commercial minutes or time—is perishable, since, if not sold in time, it has vanished and is of no value to anyone. Furthermore, there has been no showing that there is a market or market value for commercial television minutes in the same sense as there is a market and market value for goods and commodities." 48 Misc.2d at 407, 265 N.Y.S.2d at 88.

16. "We may agree with the plaintiff that the compulsory joining of two 'separate' articles is a per se violation of the act. This statement, however, solves nothing. Articles, though physically distinct, may be related through circumstances. The sound business interests of the seller or, phrasing it another way, a substantial hardship apart from the loss of the tie-in sale may be such a circumstance. It would not be thought, for example, that a one-legged man could insist on purchasing only a left shoe. Whatever may be meant by per se, we must first consider what may be fairly treated by a seller as inseparable." Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1st Cir. 1961), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961).

the product variable "so that hardly any two versions of the alleged product were the same?" (3) Was the purchaser charged for each component and not a lump sum for the total product? And (4) did the seller offer similar components for sale separately?

It is not disputed that ABC's competitors, the other two national networks, offered programs over their network stations, rather than over one individual station. Where the program is not a network program, the station itself is free to sell the broadcast time on the program directly to advertisers in either the national, regional, or local markets.

Nor was there such a variance in the number of components as would indicate a separability of products. ABC offered a going lineup to all prospective purchasers. While the number may have increased as additional stations agreed to carry the program, in the instant case Kemper was free to reject or accept such additions. Furthermore, the stations were free to accept or reject the program. "Evening Report" was not a new program or program series that had not been cleared at the time of the commencement of negotiations between Kemper and ABC. It began as a commercial program series in September 1961, and by the time negotiations commenced in 1962 it was being broadcast over a cleared lineup of 99 stations under the partial sponsorship of various advertisers. The said negotiations amounted to nothing more than the proposed purchase by Kemper "of the privilege of having itself identified" as one of the sponsors of a currently televised program and the privilege of "making use of the permissible portion thereof" for advertising purposes. Columbia Broadcasting Sys., Inc. v. Amana Refrigeration, Inc., supra 295 F.2d at 378. While it may have been technically feasible to black out Kemper's commercials over those stations which it alleges it did not

want, those blacked-out stations would have continued to broadcast "Evening Report" regardless of whether Kemper ever entered into a sponsorship agreement with the network. To the extent that variances may have existed in the number of stations carrying different network programs on the three networks, they lack significance in view of the right, at least of non-affiliated stations, not to clear a particular program so that the exact number clearing a particular program is not a matter within the exclusive control of the network.

Passing now to the third of the suggested criteria, Kemper was charged on the basis of individual time charges for an ordered station lineup. However, the ordered station lineup was demanded by Kemper. The then-current offering sheet set forth a total price per broadcast segment or a lump sum for the total product.[17]

Finally, as to whether ABC offered stations separately, it seems clear that additional stations were offered to sponsors already advertising on a particular program as such additional stations were cleared, as was done in the present case. However, even the stations which ABC owned were offered as part of a lineup for network programs, and the product we are considering involves a network program, not national spot sales or sales on the local market.

It cannot be concluded from the foregoing that separate products are involved herein; indeed, the conclusion must be to the contrary. Furthermore, the Court in *Jerrold*, supra, noted that the attitude of competitors "while relevant, is hardly conclusive"; that certainly some purchasers were interested in the completed product rather than in constructing it from individual components; and that "it was the job the system was designed to accomplish which dictated that each system be 'custom made' in the sense that there were variations * * *

17. It is important to distinguish those cases where no true unit price existed at the time of the negotiations or where such unit price was fictitious or developed

purely for the particular negotiations involved. In the instant case, ABC had the unit rates published and available to all potential advertisers.

[which] in turn, explains determining cost on a piece by piece, rather than a lump sum, basis." 187 F.Supp. at 559.

"It is apparent that, as a general rule, a manufacturer cannot be forced to deal in the minimum product that could be sold or is usually sold. On the other hand, it is equally clear that one cannot circumvent the anti-trust laws simply by claiming that he is selling a single product. The facts must be examined to ascertain whether or not there are legitimate reasons for selling normally separate items in a combined form to dispel any inferences that it is really a disguised tie-in." Ibid.

An examination of the economic facts of the television industry clearly lead to the conclusion, assuming *Amana* to be incorrect in its characterization and the transaction to be analogous to a sale of station time or station time plus program, that the packaging of station time and program, or multiple station times, is a reasonable and economically justified requirement of the industry. Indeed, Kemper would not appear to quarrel with the principle that a network presupposes a grouping of individual stations.[18] Rather, it complains that it was not permitted to make its own selection of what the group or package should contain, including the right to subtract as well as add to that package. Both the interests of the viewing public and the economics of the industry require that a network broadcast encompass a telecast over at least a minimum number of stations reaching every part of the country.[19] If Kemper is correct in its argument that a network cannot compel a sponsor to accept the network lineup as part of its sponsorship of a particular program, such an argument would affect a network of 2 stations as well as a network of 130 stations. As stated by Professor Pearson in commenting on the earlier opinion herein (221 F.Supp. 848),

"The court may have been justified in denying the motion to dismiss, but the broad language indicates that a tying arrangement results whenever the size of the package is larger than the purchaser wants. This would indeed be a startling antitrust principle if it means that the network must offer to negotiate 140 different contracts for the sponsorship of a program." Pearson, supra at 627.

If Kemper is correct in its assertion, a like argument can be applied to other advertising media. An advertiser on nation-wide media can demand that his

18. ABC was certainly entitled to obtain the greatest possible dissemination of the program it had produced.

"[I]f the primary purpose of the contract is lawful, e.g., to protect one in the fruits of his labor, and if the arrangement was actuated by or could be explained on the basis of legitimate business justification as opposed to the desire to increase market control through economic leverage, then the court will generally hold any incidental restraint of trade, not harmful to competition of the public, to be lawful. Dehydrating Process Co. v. Smith (C.A. 1 Cir. 1961) 292 F.2d 653." Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403, 408 (5th Cir. 1962).

19. "Is the 'must or minimum buy' requisite for the running of a network? Yes, is the unanimous reply of network managing executives. ABC President Robert Kinter asserted 'It is axiomatic that a minimum economic base must be maintained if the operation of a network is to be supported.' Robert Sarnoff of NBC put it in these words:

The must buy policy provides for use of a national network on a national basis. It is *essential* to networking, and each network has worked out its own formula on the matter. * * * The must buy stations * * * provide basic national circulation. They form a reasonable and logical minimum-purchase unit for national-marketing purposes.

These needs are not imaginary. It is apparent that the national television network as presently constituted could not continue to exist if it were unable to sell the time of more than a small proportion of its affiliated stations to any advertiser. Without a minimum group, fragmentation would result; the networks would be unable to meet staggering interconnection costs and national programming would be impossible." 39 Notre Dame Law. 719, 721 (1964). (Footnotes omitted.)

advertisement be published or displayed only in those areas where his business so warrants, and may recover treble damages to the extent he may have been charged for any unwanted publication or display.[20]

Network broadcasting on a national basis is necessary to provide the public varied, high-quality television on a continuous basis. High production costs make purely local telecast prohibitively expensive and local audiences are not sufficient to justify the high cost to the advertiser, and drive him to competing media. Network broadcasts spread high program costs over a much larger audience, the only way the presentation of such programs can be accomplished. Moreover, unless such programs are carried on stations reaching nearly every part of the country, major programs will be unavailable to important segments of the television public in contravention of the duty of the industry to operate in the public interest.

From an economic standpoint, a minimum undertaking by network advertisers would appear to be essential in order to assure the continuing availability and the reasonable cost of the ingredients involved in network television. Where, as here, a program is carried 5 days a week, a change in the station lineup from day to day decreases the value and attractiveness of the program to the individual sponsor and to the stations involved and creates technical difficulties.

"When two or more advertisers are sponsoring a program or program series, certain problems arise if the lineup of stations is different for the individual advertisers. Unordered stations must be 'cued' by electronic signal to delete the commercial message in the program or program segment for which they are not ordered. In connection with programs having different days of the week (e. g., daytime 'strip' programs) arrangements must be made with the advertiser or advertisers to make the program available to unordered stations on a sustaining basis, whenever possible. If opening and closing 'billboards' are used, they must take into account the fact that all of the sponsors may not have their messages on all of the stations. More important, individual stations that are not ordered by all or the majority of the advertisers may be reluctant to accept the program." F.C.C., Network Broadcasting, Report of the Network Study Staff to the Network Study Committee, H.R.Rep. No. 1297, 85th Cong., 2d Sess. 501 (1957).

Kemper argues that it was feasible for ABC to "black out" Kemper's commercials over the "unwanted" stations and has submitted evidence bearing on the cost which would have been incurred. However, assuming the correctness of Kemper's charge that the station lineup constituted a tying arrangement, ABC would have been compelled to "black out"

---

20. "Private enforcement under the Robinson-Patman and Sherman Acts raises the possibility of a proliferation of treble damage suits against all forms of mass communication. The chaos and injury to the advertising media—national television, local stations, magazines, newspapers—that might result from being required to defend and perhaps pay damages in a multitude of suits may cripple some sectors of each media. The number of potential suits might be reduced if claimants who have received some discount reductions are held to be barred from recovering damages. Nevertheless, the prospect of subjecting all media to private suits for activities that have long been established modes of business seems unfair and unnecessary; it could be avoided through a judicial or congressional decision that only damages incurred after the declaration of illegality will be held actionable. Thus, networks or other advertising media wishing to avoid liability need only comply with the provisions of the legislation ultimately held to invalidate quantity advertising discounts. If such a path is taken, a discriminatory practice that for too long a time has been permitted to stifle the growth of new products and new sources of advertising will be eliminated." Note, Antitrust Implications of Network Television Quantity Advertising Discounts, 65 Colum.L.Rev. 1213, 1255 (1965).

the commercials on a similar basis for other sponsors. It is the overall economic impact which is relevant.

Kemper's further argument that there was a tying arrangement between a "sale" of the sponsorship of the program over the stations desired by Kemper and a sale to it of broadcast time for the program over the stations it allegedly did not desire is more verbal legerdemain than legal analysis. The program and its distribution or broadcast constitute one inseparable product. As was stated some years ago:

"A device by which some networks and stations are seeking to prevent program imbalances is the 'package' program, selected, written, casted and produced by the network or station itself, and sold to the advertiser as a ready-built package, with the time specified by the station or network. In order to get a particular period of time, the advertiser must take the package program which occupies that period. This practice, still far from general, appears to be a step in the direction of returning control of programs to those licensed to operate in the public interest." Federal Communication Commission, Public Services Responsibility of Broadcast Licensees 13 (1946).

No claim is made that Kemper could not obtain sponsorship of "Evening Report" unless it agreed with ABC to sponsor some other unrelated program. Under *Amana*, any such an arrangement would clearly be a tie-in of the privilege of identification and use with respect to one program with the privilege of identification and use with respect to another unrelated program.

In consideration of the foregoing, I can only conclude that the *Amana* characterization of the type of transaction involved herein is correct, and that what Kemper purchased was "the privilege of having itself identified as sponsor of the ["Evening Report"] broadcast and making use of the permissible portion thereof for advertising its products." I do not believe that a sale

of time, or station-time, or network and station services properly characterizes the transaction. However, even if it may be so characterized, the sales involved were the proper components of one product under the authorities heretofore cited.

Furthermore, even assuming a separability of products—i. e., sponsorship and use over 95 wanted stations as distinct from sponsorship and use over 35 unwanted stations, I find that Kemper has failed to prove a "forced purchase". As already noted, the gravamen of a cause of action based upon a tying arrangement under Section 1 of the Sherman Act "is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market." Times-Picayune Publishing Co. v. United States, supra 345 U.S. at 614, 73 S.Ct. at 883. Or, as stated in Osborn v. Sinclair Ref. Co., 286 F.2d 832, 836 (4th Cir. 1960), cert. denied, 366 U.S. 963 (1961), 81 S.Ct. 1924, 6 L.Ed.2d 1255, "a seller may attempt to persuade a buyer to purchase his products rather than those of his competitors, and such salesmanship efforts do not run afoul of the anti-trust laws, unless the sale of one product (the tying product) is made under an agreement, arrangement or condition under which the buyer *must* also purchase another (the tied) product." (Emphasis added.) A tying agreement is in essence "the compulsory joining of two 'separate' articles." Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 655 (1st Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1961).

It is important to note that this is not a case of an outright refusal to sell a tying product unless the tied product is also purchased. The alleged tie-in was accomplished, according to the complaint (¶ 27), not by a refusal to "sell" less than 130 stations but was "effected by ABC informing Kemper that it would charge a rate for the broadcast time on the 95 desired stations that far exceeded

the rate for the broadcast time on the total of 130 stations which included both the desired 95 stations and the undesired 35 stations." The rate for the 95 stations that Kemper wanted, as alleged in said paragraph of the complaint, "was unreasonable, excessive [and] unrelated to any cost differential to ABC."

 To establish an illegal tying arrangement through pricing differentials, it must be shown: (a) that Kemper, in order to obtain the relatively small number of stations which it desired, was compelled to pay a price substantially as high as the price charged for a much larger package of stations which included the desired stations; [21] (b) that the price differential cannot be satisfactorily explained by quality or desirability differences or legitimate cost justifications including not only distribution costs but all other proper bases of quantity discount; and (c) that *because of this differential* Kemper selected the larger package. United States v. Loew's, Inc., 189 F.Supp. 373, 386, modified on other grounds, 371 U.S. 38, 83 S.Ct. 97, 9 L. Ed.2d 11 (1962). Other factors, which I will mention hereinafter, are also significant in any such determination. Furthermore, it must be borne in mind that the so-called coercion was allegedly practiced many months before the contract was finally negotiated and that concessions were made by ABC after the alleged coercion was practiced. We are asked to focus our attention on the initial package offer of $22,000 by Mr. Scherick of ABC on January 25, 1962, the Kemper "order" letter of May 4, 1962 and ABC's counterproposal of May 10,

1962, culminating in the meeting of May 18, 1962.

The $22,000 offer (per segment for 52 segments) of January 25, 1962, was for 99 stations that had cleared to carry the program and was not broken down into separate components of time, program and networking charges but was based roughly on a 50 per cent plus discount on time charges, without discount on the program and networking charges.

At the April 27, 1962 meeting, ABC further agreed that if it could clear the additional 28 stations requested by Kemper the latter would have to pay additional time charges not in excess of $3,000 or a total price for 127 stations of $25,000 (per segment for 39 segments). It is important to bear in mind that both the $22,000 and $25,000 figures represented a substantial markdown from the rate card, as noted in the Silver Report of which mention has been made. When Kemper submitted its totally unexpected and contradictory "order" letter of May 4, at a time when ABC had every right to believe it had a firm agreement, there appears to be little question that Kemper, while discarding the less costly and, to it, less desirable stations, utilized the same discount rates with respect to the desired stations as had been employed in fixing the original package offers. Indeed, if the original package of 99 stations is considered, Kemper was ordering the 67 included stations for substantially less than $22,000. ABC's refusal to accept such an "order" was both "legally and economically proper." United States v. Loew's, supra, 189 F.Supp. at 397. What was

21. Even if it were found that ABC demanded the full unit or rate-card rate per station for Kemper's selected list without any discount whatsoever, the differential between those rates and the average package rate would not appear to have been unreasonable in light of United States v. Loew's. In that case, in four instances Associated Artists indicated a willingness to permit selectivity at a price substantially higher than the average price per title charged for the package as a whole. In one of these contracts referred to in the note at 189

F.Supp. 373, 391, the station was told they could select films at $4,000 or $5,000 per title but instead they bought the packages of 58 films at an average cost of $1,300 per title. Another similar package offer carried an average price of $175 per picture and an offer of selectivity at $600 per picture was rejected by the station. The Court held that since the stations could have selected films out of the package at a price which was not unreasonable these contracts were not block-booked.

involved, of course, was a series of. "back and forth discussions" with order and acceptance letters "replete with conditions." However, if ABC's letter of May 10, accepting what it had believed was the true understanding of the parties, may be considered along with what transpired at the May 18 meeting, as a refusal to "sell" only the stations which Kemper wanted except at rate-card rates without any special discount, the undisputed fact is that Kemper refused to negotiate. Whatever its motive may have been, whether it was influenced by the fact that it would incur no extra cost by taking the unwanted stations, is beside the point. Having failed to negotiate a price for the stations it wanted, it cannot employ hindsight to arrive at the cost figure which would have emerged from such negotiations. Certainly no clear showing has been made that the rate-card rates were unreasonable or unrealistic or arbitrary or that they were not based on valid criteria.[22] They were certainly not designed for the negotiations involved herein or for any particular program—they formed the basis for the offering sheets and for Kemper's ordering letters.[23] When a seller has valid individual unit prices for the components of his packages he may revert to such prices when the buyer rejects the package, even though said prices are substantially higher than the average price per unit for all the components of the package. "Since this action involves *contracts* which are alleged to be in violation of the Sherman Act, we are not here concerned, except as corroborative and background information, with abortive negotiations which broke down before * * * contracts

were arrived at. It is the contract, and not incomplete negotiations which, under the issues posed by the pleadings, must be examined in order to reach a determination as to the legality or illegality of the transactions." United States v. Loew's, supra, 189 F.Supp. at 380. Since ABC had valid individual unit prices for the components of the package, Kemper's complaint would more properly be directed to its claim that the discount from such unit prices inherent in the package offer was not applicable to the selected components. Any price differential may be satisfactorily explained not only by quality or desirability differences or legitimate cost justifications but also by all other proper bases of quantity discount. But Kemper never attempted to negotiate any discount but merely assumes ex post facto what such discount would have been. It is interesting to note that at the time the contract was finally entered into, the ABC offering sheet made no provision for any special discounts for the package, the gross time charges being only subject to discounts as provided by ABC's then current rate card. Kemper never made any effort to negotiate for a selected group of stations on the basis of this offering sheet of June 13, 1962 issued approximately two months before the contract was executed. Indeed, it never attempted to negotiate a price for sponsorship of the lineup attached to the May 4th letter. Kemper recognized, as stated in the Frank letter of July 26, 1962, that ABC's program would "deliver a considerably larger number of advertising impressions for the dollars available than any other offered by any of the three networks within reach of

22. The network station rates for ABC's affiliated stations which are set forth in each affiliation agreement and form the basis for the payments ABC makes to said affiliates when they broadcast programs sponsored by network sponsors have a direct relation to the rate card furnished to advertisers, for each station's network station rate is the same as its Class "A" hourly rate set forth in the rate card. Class "A" is prime evening time; the rates to advertisers

for other time periods is a percentage of the Class "A" rate. The rates for less than one hour of broadcast time are expressed in terms of a percentage of the applicable hourly rate. For example, the rate card time charges for a quarter-hour prime time for a program like "Evening Report" are 40 per cent of the Class "A" hourly rates of the stations clearing the program.

23. See note 17, supra.

our budget." Sponsorship over the "undesired" stations was a matter of very slight consequence to Kemper—insofar as the lineup aspects of the negotiations were involved, it was concerned only with (a) the clearance of its 41 "key markets"; (b) the clearance of the 28 additional markets that it wanted (which included some of the 41 key markets); and (c) submitting a sponsorship order based upon an ordered station lineup spelling out the precise stations it was ordering, as distinguished from the then-going lineup. Mr. Kemper's letter of April 25, 1962 to Mr. Hagerty, the Kemper interoffice memoranda of April 18, May 21, May 24, June 28, July 13, July 18, and July 27, 1962, the "ABC Evening Report Terms of Agreement" of July 3, 1962, and the written communications between Kemper and the Frank Agency, especially the letter of July 26, 1962, clearly indicate that the "undesired" stations formed such a minor and inconsequential factor in the negotiations that they were never even worthy of comment, and certainly never worthy of negotiation. There is neither documentary nor other evidence that the matter of "undesired" stations (other than additions to the then-going lineup) was ever discussed after the meeting of May 18, 1962. Nor was this because ABC had shut the door against further negotiations. Kemper did not want to become involved with the problems and additional costs inherent in having its commercials blacked out over approximately one-third of the stations then carrying the program; it did not want to lose visual identification with the newscaster; it did not want to pay any price in excess of that set forth in the May 10th letter. Furthermore, Kemper did not want to share the time with other sponsors possibly utilizing the time of the "undesired" stations. At the meeting on May 18, among the matters discussed were the products of possible co-sponsors and not "pushing" the program to specific advertisers. And at the meeting between De Mark and Mr. Kemper on May 23, 1962, it was decided that "we should

buy 1 night a week and 'be on by ourselves.'" Of course, to the extent that Kemper was induced to accept the package by its desire to exclude sponsorship by competitors or others over the unwanted stations, there was no tie-in or block-booking.

The original package offer was made by Scherick of the New York office but Kemper did not see fit to go back to him and renegotiate on the basis of its own selection. I conclude that there was no refusal to renegotiate on the part of ABC. The offer which Kemper made in its letter of May 4th was, as already noted, not a reasonable one and ABC's rejection was economically and legally justified. Kemper never made any other offer for its own selection. I do not agree with its present conclusion that further negotiations would have culminated only in the fixing of an "unreasonable" figure. Kemper's burden of proof cannot be satisfied by conjecture or by a disregard of the documentary evidence reviewing the entire period of the negotiations.

I conclude, as already indicated, that only one product was involved herein as a matter of law—whether we denominate the "product" as the privilege of having the sponsor identified as sponsor and making use of the permissible portion of the broadcast for advertising its products—or whether we denominate it as the sale of an economically and reasonably justifiable combination of components. I further conclude that even were two distinct products involved, the necessary element of coercion, economic or otherwise, has not been proven.

In view of the foregoing, it is not necessary to pass on Kemper's motion for summary judgment. Even were the Court to find the necessary elements of a tying of separate and distinct products and of coercion, economic or otherwise, compelling such a tie-in, there are triable issues of fact as to whether ABC had sufficient economic power to impose the tie-in sale and whether such tie-in substantially restrained competition, if any, in the tied product so that a not insub-

stantial amount of interstate commerce was affected.

Accordingly, Kemper's motion for summary judgment is denied, and ABC's cross-motion for summary judgment is granted.

It is so ordered.